IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SOCIALCOASTER, INC., d/b/a BVIRAL, | ) ) ) |
| Plaintiff / Counter-Defendant, | ) ) |
| v. | ) ) |
| ADME (CY) LTD, d/b/a THESOUL PUBLISHING, | ) ) ) NO. 3:24-cv-00404 |
| Defendant / Counter-Plaintiff | ) JUDGE CAMPBELL ) MAGISTRATE JUDGE NEWBERN |
| V. | ) ) |
| JONATHAN BURDON, | ) ) |
| Counter-Defendant | ) |

## MEMORANDUM AND ORDER

Pending before the Court is a motion for preliminary injunction filed by Defendant/Counter-Plaintiff ADME (CY) Ltd., d/b/a TheSoul Publishing ("TheSoul"). (Doc. No. 37). Plaintiff/Counter-Defendant SocialCoaster, Inc., d/b/a BVIRAL ("BVIRAL") and Counter-Defendant Jonathan Burden filed a response in opposition (Doc. No. 47), and TheSoul filed a reply (Doc. No. 55).[1] The Court finds oral argument is not necessary to resolve the motion. Therefore, TheSoul's request for oral argument (Doc. No. 58) is DENIED.

For the reasons stated herein, the motion for preliminary injunction (Doc. No. 37) is DENIED.

---

[1] For purposes of this Memorandum and Order the Court refers to the parties by name rather than their more cumbersome party designations. In addition, the Court refers to the arguments made by BVIRAL and Jonathan Burden in their joint response as asserted by BVIRAL.

## I. BACKGROUND

TheSoul operates several Facebook pages on which it posts video content and earns a share of the revenue generated by visits to these pages. (Khazieva Decl., Doc. No. 40 at ¶ 32). A significant amount of the video content on these pages is licensed from third parties. (*Id*. ¶ 1).

BVIRAL is a video licensing company that licenses and manages the rights to over 65,000 video. (Burdon Decl., Doc. No. 48 at ¶ 1). To protect its content from unauthorized use, BVIRAL has a dedicated "Rights Management Team," the sole objective of which is to identify and address potential infringements. (*Id*. ¶ 6).

One of the ways BVIRAL addresses perceived infringements is through the procedures established by the Digital Millennium Copyright Act (DMCA). (*Id*. ¶ 9). The DMCA was enacted in 1998 "to preserve copyright enforcement on the internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider." *Canvasfish.Com, LLC v. Pixels.Com, LLC*, No. 1:23-cv-00611, 2024 WL 885356, at *10 (W.D. Mich. Mar. 1, 2024) (citing *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001)). To take advantage of the "safe harbor" for infringing material, once a service provider becomes aware of infringing content, the service provider must "act expeditiously" to remove or disable access to the material claimed to be infringing. *Id*. (citing 17 U.S.C. § 512(c)(1)).

A copyright holder can notify a service provider of infringing material by submitting a "notice of claimed infringement." 17 U.S.C. § 512(c). Once notified, to avoid liability for copyright infringement by virtue of publishing the material on its website, the service provider must disable or remove the material and notify the subscriber that it has removed or disabled access

to the allegedly infringing material. 17 U.S.C. § 512(g). If the subscriber believes that the material was removed or disabled as a result of mistake or misidentification, it may so notify the service provider by submitting a "counter notification" under penalty of perjury. *Id*. The service provider must then restore the content unless the original claimant files a copyright infringement lawsuit and notifies the service provider of the legal action. 17 U.S.C. § 512(g)(2)(C).

The DMCA provides a remedy for misrepresentations concerning the notice of claimed infringement and counternotice. 17 U.S.C. § 512(f). It states:

> Any person who knowingly materially misrepresents under this section –
>
> (1) that material or activity is infringing; or
> (2) that material or activity was removed or disabled by mistake or misidentification,
>
> shall be liable for any damages, including costs and attorney' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claims to be infringing, or in replacing the removed material or ceasing to disable access to it.

*Id*.

TheSoul claims that beginning in December 2023 BVIRAL submitted false DMCA takedown notifications to Facebook, falsely claiming that TheSoul's posts were violating BVIRAL's copyrights even though BVIRAL did not hold registered copyrights in the works and TheSoul had written non-exclusive licenses to copy and use the content that was the subject of the notices. (*See* Counterclaim, Doc. No. 14, ¶¶ 27-35; Khazieva Decl., Doc. No. 40 at ¶¶ 5-21). TheSoul claims these DMCA takedown notifications caused Facebook to take action that affected TheSoul's ability to post content to and earn revenue from its Facebook pages. TheSoul brings counterclaims against BVIRAL under the DMCA for wrongful takedown under 17 U.S.C. §

3

512(f), and under state law for defamation, intentional interference with contract, and tortious interference with business relationships. (*See* Counterclaim, Doc. No. 14).

TheSoul states that when Facebook receives DMCA takedown notice, Facebook often responds by "demonetizing" the page that contains the alleged infringing content. (Khazieva Decl., Doc. No. 40 at ¶ 32). "Demonetization" means that the content provider does not receive a share of Facebook's advertising revenue generated as a result of users viewing content on that page. (*Id*.). Pursuant to Facebook policy, if Facebook determines that a person repeatedly posts content that violates intellectual property rights, it may demonetize the page, remove the page, disable the account, or limit the ability to post photos or video. (*Id*. ¶ 35; Doc. No. 40-36). TheSoul states that this can have "a negative financial impact on the page and may lead to shadow banning." (Khazieva Decl., Doc. No. 40 at ¶ 32). "Shadow banning" is when Facebook "throttles traffic and/or lowers the visibility of a Facebook page." (*Id*. ¶ 38).

The Soul states that BVIRAL's misrepresentations concerning the notice of claimed infringement resulted in demonetization of several of its Facebook pages and estimates that the demonetization caused a loss of about $210,000 to $234,000 in revenue based on the average revenue these pages received prior to BVIRAL sending the notices of claimed infringement. (*Id*. ¶ 37). TheSoul also believes that Facebook "shadow banned" one of its Facebook pages resulting in an estimated $218,000 in damages based on the decrease in revenue of $50,000 to $65,000 per month as compared with the average revenue the page generated prior to BVIRAL sending the notices of claimed infringement. (*Id*. ¶ 38). TheSoul states that the actual damages could be higher because a particular post could go "especially 'viral' on a given day," which would result in a higher than usual amount of revenue. (*Id*. ¶ 37). It is not possible to predict whether a particular post will go viral. (*Id*.). The damages estimate does also not take into account that a post could

4

attract new followers, and that lower visibility potentially harms goodwill with TheSoul's customers and Facebook, "hinder[s] TheSoul's momentum in the industry and ability to compete with others in the market," and reduces traffic to other pages. (*Id.* ¶ 38).

TheSoul also claims that as a result of BVIRAL's notices of claimed infringement, Facebook blocked its Facebook Monetization Tools ("FMT") which means that TheSoul was unable to post content on its Facebook pages for certain amounts of time. (*Id.* ¶¶ 39, 49). TheSoul estimate that this resulted in approximately $1,100 per day in lost revenue, for a total of approximately $12,100 in damages. (*Id.* ¶ 49). In addition to lost revenue from page visits, TheSoul claims it also incurs damages due to the time and expense of having to reschedule content to be published at a later date. (*Id.*).

TheSoul seeks a preliminary injunction that would: (1) require BVIRAL and Burden to engage in a good faith in a meet and confer before sending any DMCA notices to Facebook or any other platform regarding any content posted by TheSoul; (2) require that in the event the meet and confer is unsuccessful, BVIRAL and Burden obtain a Court order before sending DMCA Notices to Facebook or any other platform; and (3) require BVIRAL to "rescind all Sham DMCA notices already submitted against TheSoul with Facebook[.]" (*See* Doc. No. 37).

## II. STANDARD OF REVIEW

"To secure a preliminary injunction, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Resources, Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *Winter v Nat. Rs. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Because a preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right,' the plaintiff must make a

'clear showing' that these factors favor him." *Id*. (quoting *Starbucks*, 602 U.S. at 345-46). The movant "faces a burden of proof 'more stringent than the proof required to survive a summary judgment motion.'" *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020).

A failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's quest for a preliminary injunction." *Enchant*, 958 F.3d at 539 (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)). But even if the plaintiff shows a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *EOG Resources*, 134 F.4th at 883 (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)). "The plaintiff must also show that some irreparable harm will take place without the court's immediate intervention." *Id*. ("While the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."). In considering the balance of equities, the Court "balance[s] the competing claims of injury[,] … consider[ing] the effect on each party of the granting or withholding of the requested relief." *EOG Resources*, 134 F.4th at 886 (citing *Winter*, 555 U.S. at 24).

### III.    ANALYSIS

Here, the Court's analysis begins and ends with irreparable harm. "To establish that they will face irreparable harm in the absence of injunctive relief, [TheSoul] must show that [it is] at risk of suffering some harm that 'is not fully compensable by monetary damages.'" *Int'l Union of Painters and Allied Trades Dist. Council No. 6 v. Smith*, __ F.4th __, 2025 WL 2170424, at *4 (6th Cir. Jul. 31, 2025) (quoting *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). "The harm must be both 'certain and immediate,' not 'speculative or theoretical.'" *Id*. (citing *D.T. v. Sumner Cty. Sch..*, 942 F.3d 324, 327 (6th Cir. 2019)).

6

TheSoul contends that in the copyright context, irreparable harm is presumed once a likelihood of success has been established, and that this presumption applies to claims under the DMCA. (Doc. No. 39 at 25 (citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532-33 (6th Cir. 2004)). The Court is not persuaded that a presumption of irreparable harm applies here for two reasons. First, a presumption of irreparable harm appears to be inconsistent with post-DMCA Supreme Court caselaw regarding injunctions. *See Winter v. Natural Resources Def. Council, Inc.*, 129 S. Ct. 365, 375 (2008) (stating that "an injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course" and noting that plaintiffs seeking preliminary relief are required to demonstrate that irreparable harm is likely in the absence of an injunction); *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) (stating that an injunction may not automatically issue once it is determined that a copyright violation has occurred; the court must apply traditional equitable considerations). The Sixth Circuit has twice declined an opportunity to formally recognize the presumption's abrogation, finding that it need not reach the issue in those cases. *See Enchant*, 958 F.3d at 540, n.3; *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503 (2022). However, the Sixth Circuit has recognized that other circuits have done away with the presumption, and that it "appears to be on its last legs." *Enchant*, 958 F.3d at 540, n.3 (collecting cases).

Second, even if the presumption applies for certain copyright related claims, the Court finds no cause to apply the presumption to claims under the DMCA for wrongful takedown under 17 U.S.C. § 512(f). Although the *Lexmark* decision recognized that there is a presumption of irreparable harm in the copyright context and stated that it saw "no reason why a similar presumption of irreparable harm should not apply to claims under the DMCA," the decision rested entirely on consideration of likelihood of success on the merits. Given that the *Lexmark* court

7

Case 3:24-cv-00404 Document 70 Filed 09/10/25 Page 7 of 9 PageID #: 986

found a preliminary injunction should not issue because *Lexmark* failed to establish a likelihood of success on the merits of any of its claims, the court's statement concerning the presumption of irreparable harm is dicta. *See Lexmark*, 387 F.3d 522, 532-33, 551. It also bears mentioning that the DMCA claim at issue in *Lexmark* was under a different provision of the DMCA. *Id*. Instead of dealing with takedown notice and counter-notice requirements of Section 512, *Lexmark* involved the provision of Section 1201, which broadly "prohibits circumvention of 'a technological measure that effectively controls access to a work protected [by copyright].'" *See id.* at 545 (*quoting* 17 U.S.C. § 1201(a)(1)). This has nothing to do with the instant dispute. Accordingly, a presumption of irreparable harm is not required and TheSoul must show that it is likely to face irreparable harm in the absence of injunctive relief. It has not done so.

TheSoul's repeated claims that the takedown notices are causing harm to revenue make it exceedingly clear that the harm can be remedied by an award of money damages. Although TheSoul claims that the precise amount of revenue loss will be difficult to calculate, is has, in fact calculated the lost revenue caused by Facebook's response to the takedown notices. Although TheSoul also claims it will lose goodwill with customers and Facebook, its does not provide any evidence that loss of goodwill will be reflected by anything other than a reduction in page views which in turn will result in lost revenue, all of which is subject to reasonable calculation and compensable with money damages. (*See* Khazieva Decl., Doc. No. 40 at ¶¶ 38, 51). TheSoul's claims that Facebook's actions in response to the takedown notices will "hinder momentum in the industry and ability to compete with others in the market" is not substantiated with any explanation or evidence warranting a finding of irreparable harm.

The Court also notes that BVIRAL began submitting takedown notices for TheSoul's allegedly infringing content in December 2023 and the last such notice was in August 2024, several

months before TheSoul sought a preliminary injunction. (*See id*. ¶¶ 5-22; Burden Decl., Doc. No. 48 at ¶¶ 75, 79, 80, 95, 106, 114, 124, 132, 137, 142, 166, 183, 191, 204, 212, 217, 223, 238). The delay is seeking relief also weighs against a finding of irreparable harm. *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x 398, 404 (6th Cir. 2013); 11A Charles A. Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 2948.1 (3d ed. 2018) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

Finally, the Court notes that the requested injunction would circumvent the process provided by Congress in the DMCA. Therefore, the public interest also weighs against granting a preliminary injunction.

## IV. CONCLUSION

For the reasons stated, TheSoul has not clearly shown that the extraordinary equitable remedy of a preliminary injunction is warranted. Accordingly, the motion for preliminary injunction (Doc. No. 37) is **DENIED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE