# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

| | |
|---|---|
| **SOCIAL COASTER, INC., d/b/a BVIRAL,** ) | |
| ) | **Case No. 3:24-cv-404** |
| **Plaintiff/Counter-Defendant,** ) | |
| ) | **Chief Judge William L. Campbell, Jr.** |
| **v.** ) | |
| ) | **Magistrate Judge Alistair Newbern** |
| **ADME (CY) LTD, d/b/a THESOUL PUBLISHING,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **Defendant/Counter-Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **Jonathan Burdon,** ) | |
| ) | |
| **Counter-Defendant.** ) | |

---

## DEFENDANT/COUNTER-PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SOCIAL COASTER, INC. d/b/a BVIRAL'S MOTION FOR SUMMARY JUDGEMENT PURSUANT TO FED. R. CIV. P. 56

---

## INTRODUCTION

Plaintiff/Counter-Defendant Social Coaster, Inc. d/b/a BVIRAL ("BVIRAL") brought a copyright infringement claim against Defendant and Counter-Plaintiff ADME (CY) Ltd. d/b/a TheSoul Publishing ("TSP") for a video it knows and admits that TSP did not infringe. And, despite having been given every opportunity to correct its mistake, BVIRAL has instead doubled downed, submitting to the Court a motion for summary judgment that pretends that the video sued on was the correct video. It was not; BVIRAL knows it was not; and yet BVIRAL is proceeding to the contrary. This alone is a fundamental basis to deny BVIRAL's Motion. Indeed, all other counts upon which BVIRAL moves for summary judgment must be denied as well. Not only are

there facts that dispute that BVIRAL is entitled to summary judgment on TSP's claims, TSP, not BVIRAL, is entitled to summary judgment as described in TSP's pending motion for summary judgment under Rule 56. For these reasons and as described further herein, BVIRAL's motion for summary judgment should be denied, and TSP be awarded its attorney's fees for opposing it.[1]

## FACTS[2]

BVIRAL initiated this lawsuit on April 8, 2024, alleging in Count I of its Complaint that TSP infringed a *specific* video, the "Making Resin Waves" video. TSP Facts at ¶¶13-14. Since its first filings in this case, TSP has been consistently adamant that it never posted the Making Resin Waves video or otherwise infringed upon it. *Id.* at ¶¶21, 25. Discovery conclusively established that TSP never infringed on the Making Resin Waves video; BVIRAL concedes that it has no evidence that TSP ever infringed on the Making Resin Waves video and, indeed, BVIRAL produced its own internal communications in which it admitted having sued on the wrong video. *Id.* at ¶83. Despite this, BVIRAL, attempts to circumvent the glaring deficiencies in the Complaint by representing to the Court that BVIRAL was really suing under a completely different video all along (the "Stunning Art" video) and asks this Court to grant it Summary Judgment on this claim.

TSP is an award-winning digital studio that produces original content entertaining countless numbers of viewers worldwide. TSP's Statement of Undisputed Facts, ECF No. 77 ("TSP's Facts") at ¶1. While TSP creates much of its own content, it also licenses a significant amount of its content from third parties. *Id.* Plaintiff and Counter-Defendant BVIRAL is a media

---

[1] TSP should, at a minimum, be awarded its attorneys' fees incurred with respect to for opposing Count I of BVIRAL's Complaint as it is obvious that there is no good faith basis for BVIRAL to continue prosecuting this claim, let alone moving for summary judgment on it.

[2] As an initial matter, BVIRAL has abused LR56.01(b) by putting forth an excessively lengthy number of immaterial and improper items in its statements of facts, including 230 statements over 55 pages, many of which constitute unfalsifiable assertions, legal statements, and conclusions of law. This is explained in more detail in TSP's Responses to BVIRAL's statement of facts.

company that owns and licenses viral videos, including approximately 65,000 videos at the time the complaint was filed and 100,000 to date. *Id.*; BVIRAL's Statement of Undisputed Facts, ECF No. 73-2 ("BVIRAL's Facts") at ¶¶1-2. In around the late summer to fall of 2023, TSP and BVIRAL began to engage in negotiations over a potential licensing contract wherein TSP would license content from BVIRAL for TSP to publish through its platforms. TSP Facts at ¶2. TSP and BVIRAL reached a tentative agreement on most, if not all, of the material aspects of a licensing agreement wherein BVIRAL would license its library to TSP and TSP would pay 50% of revenue it received from using BVIRAL's content, however, Burdon and BVIRAL pulled out of that deal and proposed a new deal consisting of a license to BVIRAL's library at $31,000 a month for two (2) years, which would amount to $744,000 in revenue from TSP to BVIRAL. *Id.* at ¶¶3-5.

On or about October 1, 2021, TSP sought permission from Ann Upton to use three videos, including the video referenced here as the "Stunning Art" video, Ms. Upton gave TSP a nonexclusive written license to use the Stunning Art video. *Id.* at ¶¶6-9. On or about January 24, 2024, Burdon, on behalf of BVIRAL, sent a DMCA notice to Meta Platforms Inc., the company that owns and operates Facebook, ("Facebook") in regard to the Stunning Art video. TSP Facts at ¶10; BVIRAL Facts at ¶65. On or about March 29, 2024, TSP issued a counter-notification with respect to the DMCA notice filed against the Stunning Art video, because TSP had a written nonexclusive license to the Stunning Art video which it confirmed from a diligent review of its records. TSP Facts at ¶¶11-12. On April 8, 2024, BVIRAL filed the Complaint in this matter in which it alleged that TSP infringed on the "Making Resin Waves" video created by Ann Upton (which is defined as the "Content" in the Complaint). *Id.* at ¶¶13-14. Because BVIRAL filed suit,

the Stunning Art video was never restored to TSP's Facebook page and TSP never reposted the Stunning Art video.  *See id.* at ¶20.[3]

It is undisputed that TSP has never published the video that is the subject of Count I of BVIRAL's Complaint – the Making Resin Waves video – and BVIRAL admits it has no evidence that TSP ever published it and now admits that it mistakenly sued TSP for infringement of this video but refuses to drop Count I.  *Id.* at ¶¶21, 25, 26; BVIRAL Facts at ¶59; BVIRAL's Memorandum in Support of Motion for Summary Judgement, ECF 73-1 (the "MSJ") Doc. 73-1 PageID # 1003.

BVIRAL claims an exclusive license to the Making Resin Waves video and the Stunning Art video, each pursuant to BVIRAL's form agreement called an Exclusive Licensing Agreement ("ELA").  TSP Facts at ¶¶15, 23, 39; BVIRAL Facts at ¶58.  There is no consideration from BVIRAL in the ELA. TSP Facts at ¶¶39-41. Burdon and BVIRAL admit that BVIRAL has no obligation to use the material licensed from a creator under the ELA and was unable to identify a single obligation that BVIRAL has under the ELA.  *Id.* at ¶¶40-41.  In other words, in exchange for receiving an exclusive, worldwide, perpetual license, BVIRAL does not have to do anything at all under the ELA. *Id*.

TSP owns and operates several different Facebook pages, where in accordance with an agreement and course of business with Facebook/Meta, TSP earns a share of the revenue generated by visits to a respective Facebook page, which BVIRAL knew about.  *Id.* at ¶¶28-29; BVIRAL Facts at ¶216; TSP Statement of Additional Undisputed Facts ("TSP Add. Facts") at ¶¶12-13.  TSP testified about this in its deposition and provided some example written contracts between itself

---

[3] BVIRAL claims to have an exclusive license to the "Making Resin Waves" video pursuant to an Exclusive Licensing Agreement ("ELA") dated September 26, 2019, and a license to the Stunning Art video pursuant to an ELA dated October 9, 2019.  *Id.* at ¶¶15, 23.

and Facebook/Meta which stated the same. *See id.* TSP has written nonexclusive licenses to several videos known as "Color Riddle," "Bird feeder sends squirrel flying," "Killer whale swims under paddleboarder" "Making a Melted Witch Bark for my Halloween party!" "Groomsmen team up to get groom PERFECTLY ready for 'first kiss' with wife," "Finding cash stash under loose tile in NYC subway," "Painting hyper realistic lightsaber," "Knut, the 1-year-old Savannah cat, calls out for mama after 2.5 weeks apart," "Street performers leave people in awe with their stunning tricks," "This duck just LOOOVES being thrown into kiddie pool." TSP Facts at ¶¶49-51, 55, 57, 59, 61-62, 66, 69-71, 75, 78-79. BVIRAL sent DMCA notices to Facebook for all of these videos (except the Melted Witch Bark video where they submitted an earnings claim to Facebook). *Id.* at 52, 56, 58, 63, 67, 69, 73, 76, 80. BVIRAL then sent DMCA Notices to Facebook for these videos from soon after Burdon scuttled the licensing agreement between BVIRAL and TSP. *See id.* at ¶¶3-5. The timing of this suggests that the DMCA Notices were an effort to punish TSP for refusing to the licensing agreement and an effort to extort TSP back to agreeing to this licensing agreement.

Because of these DMCA Notices, Facebook demonetized several of TSP's Facebook pages, which were in aggregate demonetized for 83 days causing TSP to lose between approximately $210,000 and $234,000 in revenue. *Id.* at ¶38. BVIRAL subsequently retracted some of these DMCA notices because they acknowledged that they were improperly sent and they did not have valid licenses. *Id.* at ¶36. BVIRAL knew that sending DMCA notices to Facebook would cause Facebook to demonetize these pages thereby interference with TSP's contract with Facebook. *See id.* at ¶¶28-35, 37.

In its Copyright Infringement claim, BVIRAL is seeking $744,000 in actual damages against TSP arising out of the alleged infringement of the "Making Resin Waves" video. *Id.* at ¶44. BVIRAL calculated these damages based on the total value of the licensing agreement for its

entire video library containing more than 50,000 videos that it demanded TSP to sign and pay BVIRAL $31,000 a month for two (2) years. *Id.* at ¶¶2-5, 45-46.

BVIRAL admits that its actual damages in this case are "negligible" and that it estimates that BVIRAL made between $0 and $1,000 with respect to the Making Resin Waves video and Stunning Art video. *Id.* at ¶¶47-48; BVIRAL Facts at ¶225. BVIRAL fails to provide any evidence of lost profits on account of TSP's alleged infringement. *See* TSP Facts at ¶¶44-48; BVIRAL Facts at ¶225.

## LEGAL STANDARD

"Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' Accordingly, '[e]ntry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (citations omitted). "A genuine issue exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wildasin v. Mathes*, 176 F. Supp. 3d 737, 744 (M.D. Tenn. 2016). "[T]he evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 570 (6th Cir. 2012).

## ARGUMENT

**I.      BIVRAL's Motion with Respect to Count I of the Complaint, Copyright Infringement – Must Be Denied Because BVIRAL Admits it is Suing Under the Wrong Video**

To make a claim for copyright infringement under 17 U.S.C. §501 *et seq.,* a plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements

of the work that are original." *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). BVIRAL's MSJ with respect to Count I, Copyright Infringement, must be denied because the undisputed facts (and BVIRAL's own admission) show that TSP never copied the video referenced in Count I - *i.e.* the Making Resin Waves video (identified as the "Content" in the Complaint).

Simply put, TSP never published the Making Resin Waves video. TSP Facts at ¶¶24-25. BVIRAL admits that they have no evidence that TSP ever published the Making Resin Waves video. *Id.* at ¶25. BVIRAL has known that its Count I references a video that TSP never published, evidenced because it only registered the Stunning Art video in November 2024, TSP Facts at ¶83; BVIRAL Facts at ¶74, but still has refused to dismiss this claim. Because BVIRAL has failed to prove that the TSP ever published the Making Resin Waves video, BVIRAL's MSJ with respect to Count I of its Complaint must be denied.[4] Moreover, BVIRAL concedes that it does not have any quantifiable direct damages that it suffered as the result of the alleged infringement, its concedes that its actual damages are "probably negligible." BVIRAL Facts at ¶225. The MSJ also does not claim statutory damages under the Copyright Act, which is unsurprising because neither the Making Resin Waves video nor the Stunning Art video were registered at the time of the alleged infringement.

## II.     BVIRAL Never Provided Notice to TSP that it Had a License in the Stunning Art Video and Did not Provide Notice to TSP that it had a License in any other Video through its Public Library

BVIRAL's MSJ falsely claims that it "had *twice* reached out to TSP regarding the [Stunning Art video] and included a copy of BVIRAL's exclusive license." MSJ at p. 6 Page ID# 1003; BVIRAL Facts at ¶62. This is incorrect. The October 14, 2021, email that BVIRAL

---

[4] Because BVIRAL has known its claim is frivolous and has continued to pursue it and even moved for summary judgment on it, TSP should be awarded its attorney's fees pursuant to 17 U.S.C. §505.

references (the "10/14/21 Email") was sent to an email address of TheSoul@5wpr.com (the "Email Address"). TSP Add. Facts at ¶1 TSP does not now, nor has it ever, owned, controlled, or maintained the Email Address. *Id.* at ¶2. Rather, as can be seen from the domain name of the Email Address (*i.e.* "5wpr.com") the Email Address is owned and controlled by a third-party public relations company "5WPR" this company's website is here: "https://www.5wpr.com", and as can be seen, this company uses this email domain, such as in its contact email of info@5wpr.com displayed on its homepage. *Id.* at ¶¶3-4. Finally, while the 10/21/21 Email was not provided in full, it appears highly likely that the ELA for the Making Resin Waves video, not the Stunning Art video, was attached to the 10/21/21 Email because the Making Resin Waves ELA is dated September 26, 2019, which is the date of the ELA referenced on the 10/21/21 Email. BVIRAL Facts at ¶61, Ex. 11. The ELA for the Stunning Art video is dated October 9, 2019, *id.* at ¶58, and it is clearly not referenced in the 10/21/21 Email. *Id.* at ¶61, Ex. 11. Therefore, not only is there at minimum a dispute that TSP received notice of BVIRAL's alleged license in the Stunning Art video, the undisputed facts demonstrate that BVIRAL did not actually give TSP notice that it allegedly had a license in the Stunning Art video in October 2021. Again, TSP is not responsible for BVIRAL's errors in determining the right videos to pursue its lawsuits on, nor the right people to contact to provide the notice it desires to rely on.

BVIRAL makes the further dubious claim that TSP has knowledge of what videos it purportedly held an exclusive license to because BVIRAL provided TSP with viewing access to BVIRAL's entire video catalog for a limited time. MSJ at pp. 3, 5, 11. BVIRAL—outrageously—argues this somehow constitutes TSP having actual knowledge of each and every one of BVIRAL's copyrights, and cites no caselaw in support of this proposition. TSP's team only performed a relatively brief review of this library around the time of the licensing negotiations

between the parties in 2023. TSP Facts at ¶43. TSP did not download any videos from the library, nor did it compile a list of the videos in the library. *Id.* Moreover, TSP and BVIRAL executed a Non-Disclosure Agreement ("NDA") concerning information disclosed in the course of licensing negotiations, which included the link to the video library, the NDA prohibited TSP from utilizing the video library outside of the proposed business deal, *i.e.*, TSP could not use this list to check for clip ownership if they even had reason to. *Id.* at ¶42.

### III.    BVIRAL's ELAs, Which Are the Basis for the DMCA Notices, Are Void For Lack of Consideration

BVIRAL and Burdon's MSJ is undergirded by their (erroneous) supposition that their ELAs with the video creators in question are valid and effectively transferred the copyright in the subject videos to TSP. The text of the ELAs makes it clear that the ELAs are void for lack of consideration because BVIRAL is not obligated to pay the licensor any royalties, take any action, or refrain from any action, on account of the ELA. TSP Facts at ¶¶39-41. BVIRAL is only obligated to pay the licensor if, ***in its sole and absolute discretion***, decides to take action. This is insufficient as a matter of law to constitute consideration under Tennessee law, therefore the ELA's are void and ineffective to transfer the copyrights in the subject videos to BVIRAL. *See, e.g. Pharma Conf. Educ., Inc. v. State*, 703 S.W.3d 305, 315 (Tenn. 2024); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315 (6th Cir. 2000). This matter is discussed in further detail in TSP's pending Motion for Summary Judgment, Dkt. 76 at PageID # 1632-1635 and the arguments made there are incorporated herein by reference.

### IV.    Pursuant to 17 U.S.C.§205(e) TSP's Written Nonexclusive Licenses Prevail Over BVIRAL's Purported Exclusive Licenses

17 U.S.C.§205(e) of the Copyright Act provides that a written nonexclusive license *prevails* over a preexisting transfer of copyright ownership so long as that transfer is not recorded and the nonexclusive license is taken in good faith and without notice. The statute provides:

A nonexclusive license, whether recorded or not, prevails over a conflicting transfer of copyright ownership if the license is evidenced by a written instrument signed by the owner of the rights licensed or such owner's duly authorized agent, and if— … the license was taken in good faith before recordation of the transfer and without notice of it.

17 U.S.C.§205(e). TSP has evidence that it received a written nonexclusive license for the videos subject to the DMCA Notices, so therefore, as a matter of law, TSP's licenses to these videos prevail over BVIRAL's licenses, (to the extent that they are even valid). This matter is discussed in further detail in TSP's pending Motion for Summary Judgment, Dkt. 76 at PageID # 1635-1636 and the arguments made there are incorporated herein by reference.

## V. BVIRAL's Claims are Barred Because they Engaged in Illegal Tying and Copyright Misuse

TSP has provided sufficient evidence that BVIRAL engaged in illegal tying, in violation of §1 of the Sherman Act, so therefore BVIRAL's motion for summary judgment with respect to its infringement claim must be denied on account of TSP's (pending) affirmative defense of copyright misuse. Moreover, BVIRAL and Burdon's conduct with respect to copyright misuse also constitute evidence for the improper motive/means element of TSP's Interference with Contract and Tortious Interference with Business Relations claims. This matter is discussed in further detail in TSP's pending Motion for Summary Judgment, Dkt. 76 at PageID # 1637-1642 and the arguments made there are incorporated herein by reference.

## VI. BIVRAL's Motion With Respect to Count II of the Complaint, Materially Misrepresenting DMCA Counternotice 17 U.S.C. 512(f), Must Be Denied Because it is Based on the Making Resin Waves Video, and in any Event, no Video was Restored on Account of TSP's Counternotice

BVIRAL alleges that TSP violated 17 U.S.C. §512(f) because TSP "submitted a counternotice to [Facebook] in which it alleged that it has rights in the [Making Resin Waves video] such that the Infringing Post should not have been removed from [Facebook]" Complaint

at ¶21 and "…[TSP] has violated [512(f)] by fraudulently and materially misrepresenting to [Facebook] that [TSP] had intellectual property rights in the [Making Resin Waves video].") *Id.* at ¶38. Similarly, as to why BVIRAL is not entitled to summary judgment on its Copyright Infringement claim, its §512(f) claim also fails because it is based entirely on the Making Resin Waves video. *See id.* at ¶¶21, 38. As described herein, there are no undisputed facts that TSP made any misrepresentations with respect to the Making Resin Waves video. On the contrary, the undisputed facts show that TSP never made any misrepresentation regarding the Making Resin Waves video; TSP never published the Making Resin Waves video, BVIRAL has no evidence that TSP ever published it, and the parties agree that the counternotice was sent with respect to the Stunning Art video. TSP Facts at ¶¶21, 25. Indeed, the Stunning Art video was not referenced at all in the Complaint. *Id.* at ¶22. Therefore, there are no undisputed facts demonstrating that TSP made any misrepresentation with respect to the Making Resin Waves video, therefore BVIRAL's MSJ with respect to Count II, violation of 17 U.S.C. §512(f), must be denied.

**VII.    To the Extent that the Court Considers that the 17 U.S.C. §512(f) Claim is Made with Regard to the Stunning Art Video, the Motion Still Must Be Denied Because There is Evidence that TSP had a Written Nonexclusive License with Respect to the Stunning Art Video**

The fact that BVIRAL's Complaint explicitly states that BVIRAL is suing TSP for a material misrepresentation made with respect to the Making Resin Waves video, but now, in its MSJ, argus that it is really suing under the Stunning Art video, is sufficient to show that there is a material factual dispute sufficient enough for the Court to deny BVIRAL's MSJ with respect to 17 U.S.C. §512(f). That being so, there are no undisputed facts entitling BVIRAL to summary judgment on this Count. TSP had a valid license to the Stunning Art video, and a good faith belief that it did, meaning that BVIRAL's MSJ with respect to 512(f) must be denied.

TSP had a written nonexclusive license from the creator of Stunning Art, Ann Upton, TSP Facts at ¶¶6-7 which it received in good faith and without notice of BVIRAL's alleged preexisting exclusive license. *Id.* at ¶¶6-7, 27. Before TSP issued the counter-notice, TSP made a thorough internal review and concluded that it had a right to display the Stunning Art video because it had a license to the video which Facebook took down after BVIRAL's DMCA Notice. *Id.* at ¶12. Additionally, as described in Section II, *supra*, BVIRAL never provided notice to TSP that it had a supposed nonexclusive license to the Stunning Art video prior to the counternotice, so even though BVIRAL's ELAs are void as a matter of law, TSP had not seen BVIRAL's ELA with for the Stunning Art Video prior to the Counternotice.

### VIII.  Even if TSP Made a Material Misrepresentation (which it did not) BVIRAL's 512(f) Claim Fails as a Matter of Law Because the Stunning Art Video Was Not Restored by Facebook

The plain language of 512(f) allows damages on account of a knowingly materially misrepresenting counternotice *only* if the video subject to the counternotice was restored.[5] Specifically, 512(f) states that damages are available to "any copyright owner … who is injured by such misrepresentation, *as the result of* the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, *or in replacing the removed material or ceasing to disable access to it*." (Emphasis added).  Here, the service provider (Facebook) *never* restored the Stunning Art video to TSP's Facebook page. TSP Facts at ¶20. Instead, BVIRAL filed the Complaint (albeit with respect to the Making Resin Waves Video) which prevented Facebook from restoring the Stunning Art video to TSP's Facebook page. *See* 17 U.S.C. §512(g)(2)(C). Because the Stunning Art video was never restored to TSP's Facebook page, BVIRAL has no damages under 512(f), and BVIRAL's MSJ

---

[5] Or by disabling access to the video, as the case may be.

with respect to Count II must be denied.  Indeed, BVIRAL fails to identify any damages with respect to its 512(f) claim in its interrogatories. Dkt. No. 78-6.

### IX. TSP's Counts II-IV the "State Law Claims" Are Not Preempted by the DMCA or the Copyright Act

BVIRAL's MSJ argues that it is entitled to summary judgment on TSP's counterclaims for Defamation (Count II), Intentional Interference with Contract, Tenn. Code Ann. §47-50-109 (Count III) and Tortious Interference with Business Relations (Count IV, collectively the "State Law Claims") because they are preempted by the DMCA. This is a bold assertion, especially given that the Sixth Circuit and Middle District of Tennessee have not decided whether and to what extent DMCA preemption has on claims such as the State Law Claims. The MSJ argues that "conflict preemption", specifically "obstacle preemption" bars the State Law Claims.[6] Doc. 73-1, PageID # 1013. Tellingly, BVIRAL relies entirely on out-of-circuit decisions or on Sixth Circuit decisions dealing with completely different issues that the ones relevant to this matter.

The MSJ abandons BVIRAL's previous argument that Congress intended to "occupy the field" with respect to the DMCA and now suggests that the State Law Claims are an obstacle to the DMCA and must be preempted under that theory. The Sixth Circuit describes conflict preemption as follows:

> Conflict preemption occurs when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ... In other words, "[i]f the purpose of the act cannot otherwise be accomplished—if

---

[6] There are three kinds of federal preemption, "First, 'express' preemption exists when 'Congress, in enacting a federal statute, ... express[es] a clear intent to preempt state law.' … Second, Congress may reveal its intent to preempt state enactments by 'occupying the field' of regulation with respect to a particular topic. Third, federal 'conflict' preemption may implicitly exist if state law actually conflicts with federal law, e.g., if 'compliance with both federal and state regulations is a physical impossibility.'" *Air Evac EMS, Inc. v. Robinson*, 486 F. Supp. 2d 713, 722 (M.D. Tenn. 2007) (citations omitted).  BVIRAL and Burdon do not claim "express" preemption or "occupying the field" preemption in the MSJ.

its operation within its chosen field ... must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress."

*Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.,* 776 F.3d 411, 424 (6th Cir. 2015) (citations omitted). The U.S. Supreme Court states that courts "'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "When determining whether a state law operates as a sufficient obstacle, courts must examine the federal statute as a whole and identify its purpose and intended effects. …The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption." *George v. Overall Creek Apartments, LLC*, No. 3:23-CV-00297, 2024 WL 1539848, at *6 (M.D. Tenn. Apr. 9, 2024) "Whether a state-law claim presents such an 'obstacle' depends on the federal statute's text, not on a judge's sense of what the statute's purposes might be. … A defendant bears the burden of proving preemption." *Counts v. Gen. Motors, LLC*, 139 F.4th 576, 581 (6th Cir. 2025).

Neither the Sixth Circuit nor the Middle District of Tennessee have found that Congress clearly and manifestly intended for the DMCA or the Copyright Act has preempted claims such as the State Law Claims. Nothing in the State Law Claims frustrate the DMCA takedown provision for the party sending the DMCA notice. Indeed, the intent and purpose of 17 U.S.C. 512 was more to focus on a system for **service providers** to deal with allegations of infringement on websites they operate.[7] There are no such provisions made with respect to a party who sends a DMCA

---

[7] Several paragraphs of the DMCA describes how *service providers* can limit their liability if they were to comply with 17 U.S.C. 512. *See, e.g.* 17 U.S.C. 512(b)(1)( A service provider shall not be liable for …"); 17 U.S.C. 512(e)("Limitation on Liability of Nonprofit Educational Institutions); ( 17 U.S.C. 512(g)(1)("Subject to paragraph (2), a service provider shall not be liable …);17 U.S.C. 512(g)(4)(" A service provider's compliance with paragraph (2) shall not subject the service provider to liability …); 17 U.S.C. 512(i)(1)(" The limitations on liability established by this

14

notice. In 512(f), there is nothing that says that the remedies there are the exclusive remedies with respect to content covered by the DMCA.

Section 301(a) of the Copyright Act provides a statutory framework to analyze when the Copyright Act preempts a state law claim. Although this statutory framework does not specifically apply to the DMCA, its framework is instructive when considering whether a state law claim should be preempted. *See, e.g., Long v. Bos. Sci. Corp*, 665 F. Supp. 2d 541, 553–54 (D.S.C. 2008); *In re Effexor Antitrust Litig.*, 337 F. Supp. 3d 435, 450 (D.N.J. 2018). In brief, the Sixth Circuit notes that if a state cause of action is within the scope of copyright protection and is "equivalent" to the exclusive rights under the Copyright Act, it will be preempted. *Stromback v. New Line Cinema*, 384 F.3d 283, 300-301, 304-305 (6th Cir. 2004). On the other hand, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption." *Id.* at 301.

Here, the State Law Claims all include elements different and beyond the 512(f) requirement that the representation be false. For instance, Intentional Interference with Contract, TENN. Code. ANN. §47-50-109 (Count III of the Counterclaims) has the following elements: "(1) a legal contract existed; (2) the defendants knew the contract existed; (3) the defendants intended to induce a breach of that contract; (4) the defendants acted with malice; (5) the contract was breached; (6) the defendants' actions were the proximate cause of the breach; and (7) the plaintiff

---

section shall apply to a service provider only if the service provider …"); 17 U.S.C. 512(l)(" The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense."); 17 U.S.C. 512(n)("Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.")

suffered damages." *Robinson v. City of Clarksville*, 673 S.W.3d 556, 574 (Tenn. Ct. App. 2023). Clearly, this cause of action requires numerous additional elements not needed for a claim under §512(f) of the DMCA: the DMCA does not require the existence of a contract, the defendant's knowledge of the contract, inducement to breach the contract, or breach. Therefore, as additional elements are alleged, there should be no federal preemption for this cause of action.

The same is true for Tortious Interference with Business Relationships (Count IV of the Counterclaims) which has the elements: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference." *Id.* at 573 (*quoting Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002). As is evident, this cause of action requires the knowledge of a business relationship by the defendant, the defendant intending to cause a breach or termination of the business relationship, and an improper means or motive, and one of which would satisfy the "extra element" required as well. Defamation, in addition to the requirements of §512(f), has the requirement of "resulting in an injury to the person's character and reputation." *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001).

Indeed, the gravamen of the State Law Claims is not the DMCA, *per se*, but rather, it consists of BVIRAL's and Burdon's attempts to improperly extort and/or punish TSP for refusing to agree to an unfair licensing agreement and their attempts to abuse the DMCA process by sending DMCA Notices to exact disproportionate reactions from Facebook causing Facebook to breach its

16

contracts to TSP and damaging TheSoul's business relationship with Facebook, which is not the sort of thing encompassed by 512(f).

Finally, the Eastern District of Tennessee and the Middle District of Tennessee have found that the Copyright Act does not preempt a Consumer Protection Act claim, unfair competition claim, and tortious interference claim, because these causes of action require alleging an element additional to those of the Copyright Act, or that the claims are not otherwise equivalent. *See Frank Betz Assocs., Inc. v. Signature Homes, Inc.*, No. CIV.A. 3:06-0911, 2009 WL 2151304, at *4 (M.D. Tenn. July 13, 2009; *Brittney Gobble Photography LLC*, 2017 WL 10188859, at *13 (E.D. Tenn. Sept. 5, 2017); *Whitehardt, Inc. v. McKernan*, No. 3:15-CV-01307, 2016 WL 4091626, at *7–8 (M.D. Tenn. Aug. 2, 2016). As these courts have found the same or similar causes of action to not be preempted under the Copyright Act, which is instructive here, this Court should find the same in this instant case with respect to the DMCA.

## X.    The State Law Claims are Not Subject to the Tennessee Public Participation Act in Federal Court

As an initial matter, it is improper for BVIRAL and Burdon to raise a defense of the Tennessee Public Participation Act TN Code §20-17-104 ("TPPA") more than a **year** after TSP filed its Counterclaims. This is especially the case because BVIRAL and Burdon failed to raise the TPPA as an affirmative defense in their answers and also failed to raise a First Amendment or a privilege defense in their answers as well. Indeed, the TPPA is a motion that should be brought (in state court) within sixty (60) days of service of the claim. Tenn. Code Ann. §20-17-104(b)("Such a petition may be filed within sixty (60) calendar days from the date of service of the legal action or, in the court's discretion, at any later time that the court deems proper.") Second, it is well established that the TPPA does not apply in federal court. *See, e.g. Doe v. Bucciarelli*, No. 3:24-CV-00974, 2025 WL 1479719, at *7 (M.D. Tenn. May 22, 2025) (citing cases and holding that

17

"virtually every federal district court in Tennessee has held that the procedural mechanisms of the TPPA conflict with the procedures established in the Federal Rules of Civil Procedure governing dismissal of cases and are, therefore not available in federal court."; *FemHealth USA, Inc. v. Williams*, No. 3:22-CV-00565, 2023 WL 5498055, at *6 (M.D. Tenn. Aug. 23, 2023)(Campbell, J.)("The Tennessee Court of Appeals has described the TPPA as 'combin[ing] the procedural mechanism of a Tennessee Rule of Civil Procedure Rule 12.02(6) motion to dismiss, with ... 'a procedure where the trial court evaluates the merits of a lawsuit using a summary-judgment like procedure at an early stage of litigation.'' …The court in Flade also observed that the TPPA does not create a private right of action or affect the substantive law governing any asserted claim."(quoting *Flade v. City of Shelbyville*, No. M2022-00553-COA-R3-CV, 2023 WL 2200729, at *24 (Tenn. Ct. App. Feb. 24, 2023))

Moreover, the provisions of the TPAA also fatally conflict with Rule 56 of the Federal Rules of Civil Procedure, because in a TPAA motion, the court is not required to view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Pragnell v. Franklin,* 2023 WL 2985261, at *11 n.4 (Tenn. Ct. App. Apr. 18, 2023) ("We note that the TPPA does not state that the evidence must be viewed in the light most favorable to a particular party, as is the case with summary judgment proceedings."). Therefore, the TPAA therefore plainly contradicts Rule 56, and, as in a motion to dismiss, must be ignored at this juncture as well.

BVIRAL argues that "this Court still must enforce the substantive remedies afforded by the TPPA." Doc. 73-1 PageID # 1015, n. 8. In support of this, BVIRAL and Burdon cite *Mucerino v. Martin*, 2021 WL 5585637 (M.D. Tenn., Nov. 30, 2021). This is misleading. The *Mucerino* decision does not say that the Court ***must*** enforce the substantive provisions of the TPPA. Instead, the *Mucerino* Court granted a motion to strike the TPPA petition before it, and its statements

regarding the substantive provisions of the TPPA were pure *dicta* and did not state an opinion on this question. Rather, the *Mucerino* Court made a tautological comment, noting that *if* the moving party *was right* in is position that the court should consider the substantive provision of the TPPA, the court would consider the substantive rules of the TPPA.[8] BVIRAL fails to submit any caselaw stating that a federal court must apply the "substantive" provisions of the TPPA, and the undersigned finds no such case. Rather, the federal courts who have addressed this question all hold that the TPPA conflicts with the Federal Rules of Civil Procedure, and do not apply the TPPA. This, combined with the applicable facts and BVIRAL's failure to assert this affirmative defense or meet its burden of proof, negate this Hail Mary defense.

## XI. DMCA Notices are not Privileged or Protected and are Not Preliminary to a Proposed Judicial Proceeding

BVIRAL's MSJ notes that there is immunity from liability for statements made in the course of a judicial proceeding. MSJ at 19-20. TSP does not dispute this. But obviously, the DMCA Notices are not made in the course of a judicial proceeding, so the Tennessee case law describing the privilege are inapplicable. Nor are the DMCA Notices privileged because they are made "preliminary" to a judicial proceeding. Indeed, BVIRAL and Burdon fail to cite any applicable caselaw suggesting that DMCA Notices, or anything similar to a DMCA notice, constitute material "preliminary" to a judicial proceeding. This is not surprising, because the Sixth Circuit, in reference to the Restatement (Second) of Torts, has held that for communication to be

---

[8] The relevant excerpt from this case reads as follows: "Martin protests that the court should not treat the TPPA as wholly pre-empted by the Federal Rules, because portions of the TPPA can be construed as setting forth substantive propositions of Tennessee law, particularly the substantive law of defamation and immunity for defamation. Insofar as Martin is correct on that front, the court will consider any such substantive rules, if necessary, in the context of considering his Rule 12(b)(6) motion. His reliance on the procedural framework imposed by the TPPA, however, is misplaced in this court, and the motion seeking to invoke that procedural framework must be stricken." *Mucerino*, 2021 WL 5585637,  at *6.

"preliminary" to a judicial proceeding, that communication must be related to a judicial proceeding that is actually contemplated in good faith and be under serious consideration. *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1126 (6th Cir. 1990) ("The privilege for communications preliminary to a proposed judicial proceeding, however, applies only 'when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.'") (Quoting Restatement (Second) of Torts §587 comment e, at 250).

By BVIRAL and Burdon's own testimony it is clear that BVIRAL does not "seriously consider" a lawsuit when it sends DMCA Notice. BVIRAL claims that it "manually reviews and files over 750 DMCA notices daily." BVIRAL Facts at ¶28. BVIRAL and Burdon do not claim that an attorney sent the DMCA Notices on behalf of BVIRAL. According to Pacer, BVIRAL has filed three lawsuits in Federal Court, including this one. A basic calculation shows that the chance of BVIRAL initiating up in litigation after sending a DMCA notice is *de minimis*. Assuming this rate held steady over the past two (2) years, it would mean that BVIRAL sent 547,500 DMCA notices and only filed three (3) lawsuits over this same period of time. The chance of a BVIRAL DMCA notice resulting in a lawsuit are infinitesimal, therefore, the DMCA Notices cannot be considered preliminary to a judicial proceeding. Moreover, BVIRAL and Burdon fail to present any undisputed facts that they believe the DMCA Notices were in good faith preparation of seriously considered legal action.

Additionally, courts outside of the Sixth Circuit that have found that sending DMCA Notices are **not** protected as preliminary to litigation when sent (like here) by a non-attorney. *See*

*e.g. MFB Fertility, Inc. v. Action Care Mobile Veterinary Clinic, LLC*, 730 F. Supp. 3d 740, 753 (N.D. Ill. 2024).

### XII.    The DMCA Notices are Not Matters of Public Concern

"The TPPA provides, in relevant part, that '[i]f a legal action is filed in response to a party's exercise of the right of free speech [or] right to petition ..., that party may petition the court to dismiss the legal action." Tenn. Code Ann. § 20-17-104(a). The exercise of the right of free speech is defined as "a communication made in connection with a matter of public concern ... that falls within the protection of the United States Constitution or the Tennessee Constitution." Tenn. Code Ann. § 20-17-103(3). The exercise of the right to petition is defined as "a communication that falls within the protection of the United States Constitution or the Tennessee Constitution and ... [i]s intended to encourage consideration or review of an issue by a federal, state, or local legislative, executive, judicial, or other governmental body[.]" Tenn. Code Ann. § 20-17-103(4)(A). *Black v. Baldwin*, 2025 WL 1566392, at *4 (Tenn. Ct. App. June 3, 2025)

BVIRAL claims that the DMCA Notices are a matter of public interest, MSJ at pp 20-21, but fails to cite any facts to support this contention and relies entirely on non-binding caselaw references outside of Tennessee and the 6th Circuit, specifically citing California cases. *See* MSJ at p 20.  BVIRAL provides no case law to suggest that DMCA notices are necessarily matters of public interest under applicable law and does not provide facts that show that the dispute between the parties here is significant enough to be a matter of public interest. Moreover, the subject matter of this case clearly is in regard to a commercial dispute between two corporations in the viral video business – this is not a matter of public concern.

### XIII.   BVIRAL's MSJ With Respect to Count II of Its Counterclaim, Defamation Must be Denied

The elements of defamation (libel) in Tennessee are "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; *or* 3) with reckless disregard for the truth of the statement *or* with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.* 995 S.W.2d 569, 571 (Tenn.1999)(emphasis added and citation omitted). The appropriate standard to analyze defamation in this context is negligence because TSP is not a public figure.[9] "More commonly, those classed by the courts as public figures have thrust themselves to the forefront of a particular **public controversy** in order to influence the resolution of the issues involved, inviting attention and comment." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58-59 (Tenn.Ct.App.2005) (emphasis added). "A public controversy is defined as a real dispute, the outcome of which affects the general public or some identifiable segment of the public in an appreciable way." *Id.*at 59. In short, there is no public controversy in this case. Rather, this is a private dispute between businesses. TSP has not thrust itself into any sort of public controversy, rather, TSP has reluctantly been brought into this matter by the wrongful actions of BVIRAL as described herein. Therefore, the standard to analyze BVIRAL's false written statements against TSP is a negligence standard, and BVIRAL and Burdon fail to allege undisputed facts that show they were not negligent in sending the DMCA Notices. Indeed, they admit that they send erroneous DMCA Notices from time to time and admit that multiple DMCA Notices they sent in this litigation were without merit. TSP Facts at ¶¶33, 35, 36. Therefore, BVIRAL and Burdon are not entitled to Summary Judgment on this Count.

---

[9] *See Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn.1978) ("The term 'public figure' has been defined variously by the courts as reference to the above cases will indicate. Included within this classification must be those who have thrust themselves into the vortex of important *public controversies;* those who achieve such pervasive fame or notoriety that they become public figures for all purposes, and in all contexts; those who voluntarily inject themselves, or are drawn into *public controversies*, and become public figures for a limited range of issues; and those who assume special prominence in the resolution of public questions.")(emphasis added).

**XIV. BVIRAL and Burdon's MSJ With Respect to Count III of TSP's Counterclaim, Intentional Interference with Contract – Tenn. Code Ann. § 47-50-109, Must Be Denied Because TSP Provides Evidence of All Elements of the Claim**

"Tenn.Code Ann. § 47–50–109 is designed to prevent third parties from interfering with the contractual rights of others by way of inducing one of the parties to breach its obligation to another party." *Tennison Bros., Inc. v. Thomas*, 2014 WL 3845122 at *14. The elements of intentional interference with contract are: "(1) a legal contract existed; (2) the defendants knew the contract existed; (3) the defendants intended to induce a breach of that contract; (4) the defendants acted with malice; (5) the contract was breached; (6) the defendants' actions were the proximate cause of the breach; and (7) the plaintiff suffered damages." *Robinson v. City of Clarksville*, 673 S.W.3d 556, 574 (Tenn. App. Ct. 2023). "[W]ithin the context of an action for procurement of breach of contract, the required element of 'malice' is 'the wilful violation of a known right.'" *Whalen v. Bourgeois*, 2014 WL 2949500 at *12 (Tenn. App. Ct. Jun. 27, 2014) (citations omitted). "[E]ven if the defendant does not 'act for the purpose of interfering with the contract,' it may harbor the 'requisite intent' where it 'should have known that the interference with the contract was certain or substantially certain to occur as a result of [its] conduct.'" *Rezultz Group, Inc. v. Turkheimer*, 2023 WL 1975239 at *11 (M.D. Tenn. Feb. 13, 2023) Intentional interference with contract "protect[s] 'contracts implied in fact, as well as formal, expressed contracts.'" *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W. 3D 383, 405 (Tenn. 2002).

The elements of this claim are plainly met. As described herein, TSP has a contract with Facebook and BVIRAL knows about this contract. TSP Facts at ¶¶28-29. As a part of this contract, Facebook paid TSP for page views on TSP's Facebook pages. *Id.* at ¶28. TSP Add. Facts at ¶12. BVIRAL knows that if DMCA Notices are sent to Facebook that Facebook takes punitive actions against the poster of the content by, *inter alia,* demonetizing pages. TSP Facts at ¶¶30, 34. As

evidence shows, Facebook demonetized TSP's pages after the DMCA Notices which, as TSP testified, resulted in TSP receiving hundreds of thousands of dollars in revenue less than it otherwise would have but-for BVIRAL sending the DMCA notices. TSP Facts at ¶38. As described herein, BVIRAL's ELAs are void for lack of consideration. *See* Section III, *supra*. BVIRAL knew, or should have known, that TSP's nonexclusive licenses with respect to the works underlying the DMCA Notices under 17 U.S.C. §205(e). *See* Section IV, *supra*. Moreover, BVIRAL sent multiple DMCA Notices that BVIRAL later admitted were improper. TSP Facts at ¶36. Burdon's emails and communications with TSP and the course of dealings between the parties evidence that Burdon and BVIRAL's actions are a venal effort to encourage TSP to enter into a one-sided licensing agreement. TSP Facts at ¶¶3-5. These actions were also wrongful because they constitute a Copyright Misuse and an anti-tying anti-trust violation as described herein. *See* Section V, *supra*. TSP Add. Facts at ¶¶12-13.

BVIRAL concedes that it did not have valid rights in all of the videos with respect to which it sent its MSJ. Doc. 73-1, PageID # 1020 ("with respect to **almost** every video subject to the takedowns in this case, BVIRAL had actual superior rights in the underlying work." Emphasis added). It is clear that, at minimum, there is a factual dispute, and if anything, the undisputed facts show that TSP is entitled to summary judgment on this claim, not the other way around.

### XV. BVIRAL Motion for Summary Judgment with Respect to Count IV of TSP Counterclaim, Tortious Interference with Business Relationships, Must be Denied

Under Tennessee law, the elements of tortious interference with business relations are:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference."

24

*Robinson v. City of Clarksville*, 673 S.W.3d 556, 573 (Tenn.App.Ct.2023). As stated in the above section, TSP has a relationship and contract with Facebook whereby TSP would make postings to its Facebook pages and Facebook/Meta would compensate TSP for traffic to these pages, which BVIRAL knew about. Facts at ¶¶28-29. "The Tennessee Supreme Court has identified numerous examples of improper interference including those means at [sic] are illegal or independently tortious, such as misrepresentation or deceit, defamation, and unfair competition." *Am. Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F.Supp.3d 820, 849 (M.D. Tenn. 2021).The Tennessee Supreme Court also stated that "methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition" can be examples of improper interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701, n.5.

As described above, TSP presents evidence that BVIRAL's DMCA Notices misrepresented that TSP did not have a license to post the videos in question, and BVIRAL submitted the DMCA Notices as a way to retaliate against TSP for not signing a licensing agreement and as a means to extort TSP into signing the licensing agreement, causing TSP hundreds of thousands of dollars in damages. These actions were also wrongful because they constitute copyright misuse and an anti-tying anti-trust violation.

It is clear that these deceptive business tactics are not undertaken in good faith, but that BVIRAL instead *intended* to cause damages to TSP. Indeed, to the extent that BVIRAL had a senior license to any of the works in question (which TSP denies) BVIRAL could have opted to "claim" the work through Facebook's Copyright Management Tools, which would entitle them to revenue derived from that page. BVIRAL Facts at ¶25. Instead, BVIRAL opted to send the DMCA

Notices which resulted in neither party receiving revenue from the page, and which had its intended effect, causing Facebook/Meta to demonetize TSP pages, causing TSP damages.

## CONCLUSIONS

For the reasons stated herein, TSP request that BVIRAL's Motion for Summary Judgment be denied in its entirety.

Respectfully Submitted,

*/s/ Frank Scardino*
Valentin Gurvits (MA Bar No. 643572)
Frank Scardino (MA Bar No. 703911)
Boston Law Group, PC
825 Beacon Street, Suite 20
Newton, MA 02459
Telephone: 617-928-1804
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com
*Admitted pro hac vice*

and

*/s/ S. Chase Fann*
S. Chase Fann (TN Bar No. 036794)
Spencer Fane LLP
511 Union Street, Suite 1000
Nashville, TN 37219
Telephone: 615-238-6300
Facsimile: 615-238-6301
cfann@spencerfane.com

*Attorneys for Defendant/Counter-Plaintiff ADME (CY) LTD, d/b/a TheSoul Publishing*

26

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that the following was served via the Court's ECF system on November 7, 2025, to the following:

Jacob T. Clabo
Jay Scott Bowen
Griffin Bowen, PLLC
48 Music Square East
Nashville, Tennessee 37203
jclabo@griffenbowen.com
jbowen@griffenbowen.com

Lauren M. Spahn
Tsveta Todorova-Kelly
Buchalter, A Professional Corporation
1 Music Circle South, Suite 300
Nashville, TN  37203
lspahn@buchalter.com
ttodorovakelly@buchalter.com

*Attorneys for Plaintiff/Counter-Defendants*

By:<u>/s/ Frank Scardino</u>

27

Case 3:24-cv-00404   Document 84   Filed 11/07/25   Page 27 of 27 PageID #: 2003